**JOHN ROBB**, OSB No. 104910
john@salirobb.com
**MORGAN DETHMAN**, OSB No. 092398
morgan@salirobb.com
Sali Robb LLC
1000 SW Broadway, Suite 2150
Portland, OR 97205
Telephone:  (971) 407-3370
Facsimile:   (503) 765-5377

Attorneys for Defendant Beniamin Lucescu

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:24-cr-00235-AB-1 |
| Plaintiff, | |
| vs. | DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM |
| BENIAMIN LUCESCU, | |
| Defendant. | |

Defendant Beniamin Lucescu, through counsel, submits this trial memorandum in advance of the trial scheduled to begin September 8, 2026.

## I.    Introduction

Mr. Lucescu and his wife, Georgeta Lucescu, are being criminally prosecuted on a highly unusual theory of promissory fraud related to an Economic Injury and Disaster Loan (EIDL) and two loan modifications they applied for during the pandemic. While there was rampant fraud related to EIDL loan applications during that time, and prosecutions alleging fraudulent EIDL

PAGE 1 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

loan applications during the pandemic are certainly not unusual, in this case the government is going forward on a very specific theory of promissory fraud related to the use of the loan proceeds. The government is not alleging any fraud related to the Lucescus' application for the loan, or general eligibility to receive the loan itself. The sole allegation of fraud is related to language contained in the closing documents they signed after the loan was approved. The defense has found very few examples of the government pursuing this specific theory of fraud nationwide and believes this is the sole case of its type that has been brought in the District of Oregon.

As outlined in the superseding indictment (ECF 31) and government's bill of particulars (ECF 62), the theory of fraud relies on statements contained in documents titled Loan Authorization and Agreement (LA&A) and Security Agreement, which were signed after loan approval, but before the EIDL loans were funded. Specifically, the government alleges that by signing these documents, the Lucescus knowingly endorsed and understood the following statements:

- "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020 and continuing thereafter…" and

- "Borrower certifies that: … (e) none of the Obligations are or will be primarily for personal, family or household purposes[.]"

(ECF 62 at 4).

To prove their case, "the government intends to prove that when defendants executed the three LA&As, they intended to use the [EIDL] proceeds to pay off pre-covid personal federal tax debt and transfer the money to a personal cryptocurrency account, and they knew these uses were

PAGE 2 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

prohibited under the LA&A." *Id*. These statements were contained in 19 pages of legal documents, offered to the Lucescus for electronic signature via Docusign following approval of their loan application. None of the above terms were further defined in these documents.

## I.     Factual Background

Beniamin Lucescu and Georgeta Lucescu were born in Romania and immigrated to the United States as adults, eventually becoming naturalized citizens. As the pandemic struck in 2020, the Lucescus lived in a small home in southeast Portland with their five children. A sixth child was born in 2021. Throughout the decade leading up to the pandemic, the primary source of the family's income was a business the Lucescus ran out of their home called Rose City Senior Care, LLC. Their line of work—residential assisted living care for seniors—was hit especially hard during the pandemic.

The process to obtain an EIDL loan involved an initial application to the Small Business Administration (SBA) which included information regarding the business, such as number of employees, gross revenue, and cost of goods sold. Once the SBA processed and approved the application, closing documents were made available to the applicants for electronic signature via Docusign. The government does not allege anything in the initial application was false. It is Lucescus' completion of these closing documents, which contained the certifications quoted above, is what is at issue in this case.

Prior to the pandemic, Mr. Lucescu was making regular restitution payments based on a previous conviction for wire fraud and bank fraud in the District of Oregon. The allegations in that case were brought in 2009 and related to Mr. Lucescu's work as a residential mortgage broker in 2007. In November 2022, the government filed for a writ of garnishment with the

PAGE 3 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

court, asking for full payment of the several hundred-thousand-dollar remaining restitution balance. *United States v. Beniamin Lucescu*, 3:09-cr-00247 (ECF 84).

During litigation of the garnishment proceedings, Mr. Lucescu filed a document he titled "Defendant's Memorandum to the Court," in which he described his family and financial circumstances leading up to the garnishment proceedings. This memorandum included descriptions of taking out and using and transferring proceeds from the EIDL loans at issue in the case, and the defense expects the government to use this memorandum as their primary evidence regarding Mr. Lucescu's intended use of loan proceeds at the time the LA&A and Security Agreement documents were signed.

## 2. Pretrial Issues

### A. Request for Attorney Voir Dire

The defense has separately submitted requested voir dire topics and questions, and requests that the parties be permitted to conduct brief voir dire of the panel following the Court's questioning.

### B. Facts and Legal Issues Pertinent to Admission of Mr. Lucescu's Prior Convictions

One of the critical issues the Court will need to decide before the trial begins is whether and the extent to which the government will be permitted to introduce evidence related to Mr. Lucescu's prior fraud convictions. The government has indicated it will be moving to admit these convictions under Rule 404(b), and the defense will wait to respond in detail to the government's specific theories of admissibility. At the outset, however, the defense would like to briefly address some specific issues regarding the facts of this case and proof requirements for government's fraud theory that it would like the Court to consider regarding the contested pretrial issues in this case.

PAGE 4 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

### i.    Factual Details of the Current Allegations

The EIDL application process involved making an initial application, waiting for approval, and then signing various closing documents before the proceeds were disbursed. The initial application involved logging into a government website and going through a series of pages in which the applicant was asked to affirmatively agree to eligibility requirements and input specific information regarding their business. The following are screenshots of portions of this process:







As best as defense counsel can determine, the applicant was not required to make any

affirmative representations or agreements regarding their intended use of the loan proceeds

PAGE 6 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

during this initial application process. Nor does it appear the application included information

regarding how the SBA intended the funds to be used. The sole reference counsel has located

regarding use of funds in the application was the sentence, "Whoever wrongfully misapplies the

proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal

to one-half times the original principal amount of the loan under 15 U.S.C. 636(b)." This

sentence was in this context in the application:



Following approval of the loan, the SBA sent the applicant an email telling them the loan

was approved and inviting them to log into the online portal. For the Lucescus' initial loan

application and subsequent first modification request, the time between the submission of the

initial application and signing of the closing documents was nearly three months. For the final

PAGE 7 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

loan modification, this period was slightly longer than one month. When the user logged into the electronic portal, the loan closing documents, including the LA&A and Security Agreement referred to above, were available for electronic review and signature with Docusign. The closing documents were 19 pages total, and the language the government relies on to prove their fraud theory appeared in the following contexts:

DocuSign Envelope ID: 8F2A5593-AC61-47B6-A119-B5F97F7CDB16                    Doc # L-01-3706175-01

SBA Loan #4736878201                                                          Application #3600888817

**REQUIREMENTS RELATIVE TO COLLATERAL**

- Borrower will not sell or transfer any collateral (except normal inventory turnover in the ordinary course of business) described in the "Collateral" paragraph hereof without the prior written consent of SBA.

**USE OF LOAN PROCEEDS**

- Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter and to pay Uniform Commercial Code (UCC) lien filing fees and a third-party UCC handling charge of $100 which will be deducted from the Loan amount stated above.

**REQUIREMENTS FOR USE OF LOAN PROCEEDS AND RECEIPTS**

- Borrower will obtain and itemize receipts (paid receipts, paid invoices or cancelled checks) and contracts for all Loan funds spent and retain these receipts for 3 years from the date of the final disbursement. Prior to each subsequent disbursement (if any) and whenever requested by SBA, Borrower will submit to SBA such itemization together with copies of the receipts.

- Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business area in which the disaster occurred. To request SBA's prior written permission to relocate, Borrower will present to SBA the reasons therefore and a description or address of the relocation site. Determinations of (1) whether a relocation is voluntary or otherwise, and (2) whether any site other than the disaster-affected location is within the business area in which the disaster occurred, will be made solely by SBA.

- Borrower will, to the extent feasible, purchase only American-made equipment and products with the proceeds of this Loan.

- Borrower will make any request for a loan increase for additional disaster-related damages as soon as possible after the need for a loan increase is discovered. The SBA will not consider a request for a loan increase received more than **two (2)** years from the date of loan approval unless, in the sole discretion of the SBA, there are extraordinary and unforeseeable circumstances beyond the control of the borrower.

**DEADLINE FOR RETURN OF LOAN CLOSING DOCUMENTS**

- **Borrower will sign and return the loan closing documents to SBA within 2 months of the date of this Loan Authorization and Agreement**. By notifying the Borrower in writing, SBA may cancel this Loan if the Borrower fails to meet this requirement. The Borrower may submit and the SBA may, in its sole discretion, accept documents after 2 months of the date of this Loan Authorization and Agreement.

**COMPENSATION FROM OTHER SOURCES**

- Eligibility for this disaster Loan is limited to disaster losses that are not compensated by other sources. Other sources include but are not limited to: (1) proceeds of policies of insurance or other indemnifications, (2) grants or other reimbursement (including loans) from government agencies or private organizations, (3)

Page 3 of 11

SBA Form 1391 (5-00)                                                          Ref 50 30

PAGE 8 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

DocuSign Envelope ID: 8F2A5593-AC61-47B6-A119-B5F97F7CDB16

Doc # L-01-3706175-01

SBA Loan #4736878201

Application #3600888817

14.    **BORROWER CERTIFICATIONS.**

Borrower certifies that: (a) its Name (or Names) as stated above is correct; (b) all Collateral is owned or titled in the Borrower's name and not in the name of any other organization or individual; (c) Borrower has the legal authority to grant the security interest in the Collateral; (d) Borrower's ownership in or title to the Collateral is free of all adverse claims, liens, or security interests (unless expressly permitted by Secured Party); (e) none of the Obligations are or will be primarily for personal, family or household purposes; (f) none of the Collateral is or will be used, or has been or will be bought primarily for personal, family or household purposes; (g) Borrower has read and understands the meaning and effect of all terms of this Agreement.

15.    **BORROWER NAME(S) AND SIGNATURE(S).**

By signing or otherwise authenticating below, each individual and each organization becomes jointly and severally obligated as a Borrower under this Agreement.

**Rose City Senior Care, LLC**

DocuSigned by:

*Georgeta Lucescu*

56062B50EDA247E...

Date:    08.06.2020

Georgeta Lucescu, Owner/Officer

## ii.    What the Government Needs to Establish in this Case

To prove their fraud theory, the government will need to prove beyond a reasonable doubt that at the time the closing documents were signed, the Lucescus:

- Knew the closing documents included language stating they intended to use the loan proceeds "solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020," and that "none of the Obligations are or will be primarily for personal, family, or household purposes."

- Knew that they would not obtain the loan funds unless they made these representations.

- Intended to use some of the proceeds to pay taxes they owed as a result of past years' business profits and to transfer other proceeds into a financial account they expected to increase in value.[1]

- Understood that using some loan proceeds to pay these taxes and transferring other proceeds into the financial account was not use as "working capital" or was "primarily for personal, family, or household purposes"—therefore understanding they were making false representations.

- Had a conscious objective to lie about their planned use of the loan proceeds in order to deceive and cheat the SBA.

For the conspiracy charge, the government also needs to prove beyond a reasonable doubt that the Lucescus made an agreement to lie about their planned use of the proceeds in order to deceive and cheat the SBA.

### iii.    Pertinent Legal Principles

Use of prior misconduct of a defendant in a current prosecution "is not looked upon with favor." *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994) (quoting *United States v. Bradley*, 5 F.3d 1317, 1310 (9th Cir. 1993). "Rule 404 of the Federal Rules of Evidence prohibits evidence about a defendant's character trait to prove that the defendant committed the charged crime when he acted in accordance with that character trait." *United States v. Charley,* 1 F.4th 637, 640 (9th Cir. 2021). This is because:

> We have stated that our reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is. Thus, guilt or innocence of the accused must be established by evidence relevant to the

---

[1] This is obviously a different way of framing their intent than as described by the government, but it is just as factually accurate. The primary source of income for the Lucescus during the tax years the payments were applied to was profits generated by their business.

PAGE 10 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing.

*Mayans*, 17 F.3d at 1181 (still quoting *Bradley*).

When the government offers this type of evidence, it is required to "precisely articulate the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *Id*. Factual similarity between the previous conduct and charged offense is the touchstone. In the context of showing knowledge, "the government must prove a logical connection between the knowledge gained as a result of the commission of the prior act and the knowledge at issue in the charged act." *Id*. at 1181-82. In the context of showing "identity, *modus operandi*, or absence of mistake or accident, such evidence simply lacks probative value unless it is sufficiently similar to the subsequent offense." *United States v. Miller*, 874 F.2d 1255, 1269 (9th Cir. 1989). In the context of proving intent, "similarity is always required to prove identity of intent, since, 'if the prior act is not similar, it does not tell the jury anything about what the defendant intended to do in his later action.'" *United States v. Ramirez-Jiminez*, 967 F.3d 1321, 1326 (9th Cir. 1992) (quoting *Miller*).

Even if the government can establish the elements of initial admission, the evidence still needs to survive an analysis comparing the probative value versus prejudicial effect under Rule 403. "Where the probative value is slight, moderate prejudice is unacceptable." *United States v. Ramirez-Robles*, 386 F.3d 1234, 1243 (9th Cir. 2004). When the prior bad act evidence is a previous criminal conviction for the same crime charged in the current case, the 9th Circuit has emphasized this is uniquely prejudicial:

> To allow evidence of a prior conviction of the very crime for which a defendant is on trial may be devastating in its potential impact on a jury. As we recognized in *United States v. Field,* 625 F.2d 862, 872 (9th Cir.1980), where, as here, the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the

PAGE 11 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again. Such a risk was clearly present in this case.

*United States v. Bagley*, 772 F.2d 482, 488 (9th Cir. 1985)

The defense is not currently aware of the logical and factual arguments the government will make in support of its request to admit 404(b) evidence, and will address this in a responsive pleading.

**C.      Objection to a Deliberate Ignorance Instruction**

**i.      Legal Principles**

As the Supreme Court has described the deliberate ignorance, or willful blindness, framework, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (citing G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961) ("A court can properly find willful blindness only where it can almost be said that the defendant actually knew.")). The Court contrasted this with recklessness, in which one "knows of a substantial an unjustified risk of such wrongdoing," and negligence, in which one "should have known of a similar risk but, in fact, did not see." *Id*. In the Court's view, requiring this high threshold "give[s] willful blindness a limited scope that surpasses recklessness and negligence." *Id*.

For a deliberate ignorance instruction to be given, there needs to be an adequate evidentiary basis to believe the defendant had "a subjective belief there is a high probability a fact exist[ed]," and took "deliberate actions to avoid learning the truth." *United States v. Yi*, 704 F.3d 800, 804 (9th Cir. 2013) (citing *Glob.-Tech Appliances, Inc.*). "The instruction is inappropriate where the evidence could justify one of two conclusions, either that the defendant

PAGE 12 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

had knowledge, or that the defendant did not, but not a third conclusion, that the defendant deliberately shut her eyes to avoid confirming the existence of a fact she all but knew." *United States v. Mapelli*, 971 F.2d 284, 286 (9th Cir. 1992).

To find a defendant acted deliberately under this instruction, it is necessary for the jury to find that the defendant acted with a high degree of intent. "A deliberate action is one that is '[i]ntentional; premeditated; fully considered.'" *United States v. Heredia*, 483 F.3d 913, 920 (9th Cir. 2007). Therefore, for a deliberate ignorance instruction to be appropriate, the government's evidence will need to support a conclusion that Mr. Lucescu was himself actually aware of a high probability—so high a probability that he basically knew it to be true—of the requisite knowledge elements and took a fully considered and consciously thought-out action to avoid finding out for sure.

The question for the district court in deciding whether to give a deliberate ignorance instruction "whether the jury could rationally find willful blindness even though it has rejected the government's evidence of actual knowledge." *Id*. at 922. Since a jury is required to find any element of a criminal charge beyond a reasonable doubt, this necessarily requires courts to determine whether a jury could rationally find willful blindness—and thus the knowledge element—beyond a reasonable doubt. *United States v. Velazquez*, 1 F.4th 1132, 1137 (9th Cir. 2021) ("In a criminal trial, 'no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.'") (quoting *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)).

For decades after the willful blindness instruction was first approved by the 9th Circuit in *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976), it was a disfavored instruction in the

PAGE 13 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

circuit. *See, e.g. United States v. Baron,* 94 F.3d 1312, 1318 n. 3 (9th Cir. 1996) ("We emphasize again today, as we have in the past, that a *Jewell* instruction is rarely appropriate."); *United States v. Sanchez–Robles,* 927 F.2d 1070, 1073 (9th Cir. 1991) ("[W]e have recognized that the instruction should be used sparingly."); *United States v. Alvarado,* 817 F.2d 580, 584 (9th Cir.1987) ("The cases in which the facts point to deliberate ignorance are relatively rare."); *United States v. Garzon,* 688 F.2d 607, 609 (9th Cir.1982) ("The instruction should be given rarely because of the risk that the jury will convict on a standard of negligence."); *United States v. Murrieta–Bejarano,* 552 F.2d 1323, 1325 (9th Cir. 1997) ("The *Jewell* instruction should not be given in every case where a defendant claims a lack of knowledge, but only in those comparatively rare cases where, in addition, there are facts that point in the direction of deliberate ignorance."); *Mapelli*, 971 F.2d at 286 ("The instruction is inappropriate where the facts point to actual knowledge rather than deliberate ignorance, … and should otherwise be used 'sparingly.'… It is not a routine instruction for cases in which knowledge is at issue.") (internal citations omitted).

In 2007, the 9th Circuit addressed the deliberate ignorance instruction in detail in *United States v. Heredia*, 483 F.3d 913, 920 (9th Cir. 2007). While overruling previous cases characterizing a deliberate ignorance instruction as disfavored only to the extent they are read to imply an additional legal *requirement* for this instruction, the court in *Heredia* emphasized that district courts retained broad discretion to decline to give such an instruction based on the unique factual circumstances of the cases before them. *Heredia*, 483 F.3d at 924 ("Even if the factual predicates of the instruction are present, the district judge has discretion to refuse it.")

PAGE 14 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

###    iii.    Application to this Case

It is not possible to begin the analysis of whether a deliberate ignorance instruction should be given before determining what knowledge needs to be shown to satisfy the elements of the crime the government has charged. The proposed deliberate ignorance instruction the government shared with the defense characterizes the required knowledge finding this way: "the defendant was aware of a high probability that the use of Economic Injury Disaster Loan funds was limited to permissible business purposes." This falls miles below the requisite knowledge the government needs to show in this case.

Mr. Lucescu is not being criminally charged with misusing EIDL funds. Misuse of EIDL funds is a civil matter, not a criminal offense.

Mr. Lucescu is being charged with *fraud*, meaning he knowingly lied with the intent to deceive and cheat. And he also charged with money laundering, meaning he transferred money *knowing* it was criminally derived. Allowing the government to proceed on a legally invalid theory of fraud—which would be the case if the jury was in effect instructed that it only needed to find knowledge of misuse of loan proceeds—would be clear error. *See United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021) ("constitutional error occurs when a jury returns a general verdict that may rest on a legally invalid theory") (quoting *Skilling v. United States*, 561 U.S. 358, 414 (2010), internal quotations omitted).

As described above, to prove the knowledge element for fraud under a deliberate ignorance framework, the government will need to provide evidence that shows, beyond a reasonable doubt, that Mr. Lucescu was subjectively aware of a high probability that:

- The closing documents included language stating they intended to use the loan proceeds "solely as working capital to alleviate economic injury caused by the disaster occurring in

PAGE 15 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

the month of January 31, 2020," and that "none of the Obligations are or will be primarily for personal, family, or household purposes."

- That he would not obtain the loan funds unless these representations were made.

- Using some loan proceeds to pay taxes owed due to past business profits and transferring other proceeds into a financial account expected to increase in value was not use as "working capital" or was "primarily for personal, family, or household purposes."

And, that Mr. Lucescu took a fully thought through and conscious action to avoid confirming the high probability that the above was true. Whether he was aware of a high probability that the money he transferred was criminally derived obviously flows directly from the above.

Several issues become readily apparent when looking at the requisite knowledge elements accurately. The first is that is far from apparent to defense counsel that the language in the LA&A and Security Agreement *does* prohibit paying IRS tax debts derived from previous business profits[2] or transferring money into a financial account. This is even more apparent when viewed with the beyond a reasonable doubt standard required for criminal charges, as opposed to the applicable standards if this matter was being handled civilly. [3] The key language is not

---

[2] Even beyond the un-defined language in the closing documents, the SBA's Standard Operating Procedure [for] Disaster Assistance Program ("SOP 50 39 9") permitted using EIDL proceeds as follows:

    I    EIDL proceeds may not be used for …

    II    8. Payment of any part of a direct Federal debt, (including SBA loans) *except* IRS obligations.

(SOP 50 39 9 at *75-76) (emphasis added). SOP 50 39 9 is available at https://legacy.sba.gov/document/sop-50-30-9-disaster-assistance-program (last viewed July 30, 2026)

[3] In a recent bankruptcy case, the court found "[w]hile the SBA did not define the term 'working capital' in the EIDL Application or in the Loan Agreement, Schoenmann could have asked for clarification of the term at any point in the application process." *In re Schoenmann*, 2025 Bankr. LEXIS 1603, *10, 2025 LX 247794, 2025 WL 1840384 (Bankr. N.D. Cal). In *Schoemann*, the

PAGE 16 –     DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

defined in the documents, and one could certainly come to a reasonable, non-speculative, conclusion that the language, absent further definition, *might not* prohibit this type of use—the definition of a reasonable doubt.

Whether the language in the closing documents does in fact, beyond a reasonable doubt, prohibit the Lucescus' use and transfer of the proceeds will be a highly contested issue before the jury. Accordingly, it would be inappropriate for the Court to further comment on the evidence by telling the jury this language means what the government asserts it does. By giving an instruction that assumes a contested fact in favor of the government's case, the Court would be making a direct comment on the evidence in the government's favor, and effectively denying Mr. Lucescu his right to a fair jury trial that issue. *See United States v. Evanston*, 651 F.3d 1080, 1085 (9th Cir. 2011) (citing and quoting Supreme Court precedent for the ideas that "the influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received by the jury with deference, and may prove controlling," and "the trial judge must take great care to avoid commenting upon evidence in a one-sided manner") (internal quotes, citations, and brackets omitted).

The same principle applies to the description of what the Luescus intended to do with the loan proceeds. The government's proposed language is "paying personal tax debts and investing in cryptocurrency." The Lucescus' intent was at the time they executed the closing documents is an issue of fact that needs to be resolved by the jury. Factual findings on that issue also need to be left to the province of the jury, not assumed to be true by the Court in a jury instruction.

---

court refused to discharge the debtor's EIDL loan because the debtor neglected to investigate how EIDL proceeds could be used. But negligence is not the *mens rea* for wire fraud, the standard is knowledge and having an intent to deceive and cheat, and the burden of proof is beyond a reasonable doubt.

PAGE 17 –    DEFENDANT BENIAMIN LUCESCU'S TRIAL MEMORANDUM

At a minimum, defense counsel asks the Court to hold ruling on this issue until the close of evidence, and prohibit the parties from referring to the deliberate ignorance concept in opening statement or during the evidentiary phase of the trial. Whether to provide a deliberate ignorance instruction is a decision left to the sound discretion of the district court, with a careful consideration of the actual evidence and issues in the case. At this point, it is not clear that even the parties fully understand how evidence pertinent to the issue will develop during trial.

DATED:  July 31, 2026

SALI ROBB LLC

By:        s/John Robb
           JOHN ROBB, OSB No. 104910

           s/Morgan Dethman
           MORGAN DETHMAN, OSB No. 092398
           Attorneys for Defendant Beniamin Lucescu